MICHIGAN WELFARE RIGHTS ORGANIZATION et al., Plaintiffs,

v.

John T. DEMPSEY, Individually and acting in his official capacity as Director, Michigan Department of Social Services, Defendant.

Civ. A. Nos. 8–71562, 8–71805, 8–72078 and 8–72294.

United States District Court, E. D. Michigan, S. D.

Dec. 6, 1978.

Kenneth L. Lewis, Michigan Legal Services, Detroit, Mich., Susan D. Bittner, Ann Arbor, Mich., for plaintiffs.

Mark S. Meadows, Asst. Atty. Gen., Lansing, Mich., for defendant.

MEMORANDUM OPINION AND ORDER CERTIFYING CLASS AND GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PHILIP PRATT, District Judge.

These are actions for declaratory and injunctive relief brought by and on behalf of

certain welfare recipients against John T. Dempsey in his capacity as Director of the Michigan Department of Social Services. Because they arise out of the same factual setting and present identical legal issues, all four cases have been consolidated for consideration and disposition in the same proceeding. Several individuals have also been permitted to intervene as plaintiffs upon stipulation.

Since the institution of the first of these suits a temporary restraining order has been in force. On two earlier occasions the matter came before the Court for argument on defendant's motion to dismiss and on plaintiffs' motions for class certification and for preliminary injunction; on each occasion counsel agreed to adjourn the hearing and defendant stipulated to extend the temporary restraining order with respect to all plaintiffs who were then parties to these cases or who would subsequently be permitted to intervene. On the last such occasion the Court suggested to counsel that as there appeared to exist no genuine disputes of material fact, the cases lent themselves to an expeditious determination on cross-motions for summary judgment. Counsel responded with a stipulated set of facts and two sets of briefs with reference thereto. Oral arguments were heard on all pending motions at a special hearing on November 16, 1978. Counsel are to be commended for the superior quality of their briefs and for the edifying example they have set of professional cooperation toward the goal of a prompt and—it is earnestly to be hoped—just resolution.

The facts are not complex. The Court takes judicial notice that the Michigan Social Welfare Act, M.C.L.A. § 400.1 *et seq.*, was designed, among other things, to take advantage of the benefits made available to the States under the Social Security Act, 42 U.S.C. § 301 *et seq.*, and specifically (for purposes of this litigation) of the Aid to Families with Dependent Children (AFDC) program established under Title IV of the Act, 42 U.S.C. §§ 601–610. The Court takes further notice that the Michigan Department of Social Services (DSS) is the State agency charged with the administration of the AFDC program within Michigan. M.C. L.A. § 400.1(1). The plaintiffs are (1) female recipients of benefits under the AFDC program administered by the DSS and (2) two organizations composed in substantial part of such persons. Each of the individual plaintiffs alleges and has submitted an affidavit to the effect that she has been the object of physically and emotionally abusive treatment at the hands of her husband or boyfriend and that she fears a recurrence of such treatment if the husband/boyfriend were to learn of her present whereabouts. The organizational plaintiffs count among their members similarly situated women.

It is stipulated that in applying for AFDC benefits, the applicant must fill out a form, designated DSS form 322, on which she is to set forth such information as her name, current address, source of income, personal property, assets, liabilities, marital status, citizenship, race, family background, eating arrangements, health history, and employment history.

Pursuant to DSS policy implementing a State statute, certain of the information thus gained is made available to the inquiring public; the DSS follows a practice of disclosing to any member of the general public who is willing to present a completed form, designated DSS form 63, the name, address, and amount of assistance of any given recipient of AFDC funds. The form 63 notifies the requesting party that it is prohibited that the information disclosed be used for political or commercial purposes, but the requesting party is not required by law or policy to disclose the purpose for which he seeks the information requested.

The whereabouts of certain of the individual plaintiffs and of certain members of the organizational plaintiffs have been discovered in this way by husbands or boyfriends who have thereupon renewed their patterns of abuse. All of the individual plaintiffs fear that they may suffer the same fate. On behalf of themselves and all persons similarly situated, they seek a declaration that the Michigan statute, policy, and practice are repugnant to the Social

Security Act and regulations and to the United States Constitution; on that basis they also seek an injunction prohibiting the application of that statute, policy, and practice with respect to themselves and the class they purport to represent.

## JURISDICTION

At the outset the Court must address and dispose of a jurisdictional objection raised by defendant before it may properly proceed to the other questions before it. *See Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). On July 18, 1978 the State filed a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the ground that the plaintiff's Complaint failed to present a real case or controversy.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides:

"*In a case of actual controversy within its jurisdiction*, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1954, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." (1978 Supp.) (Emphasis added.)

In *Maryland Casualty Co. v. Pacific Coal and Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941) at 273, the Supreme Court articulated the spirit in which the "actual controversy" requirement is to be tested:

"The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See also Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, at 122, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); *Lake Carriers' Assn. v. MacMullan*, 406 U.S. 498, at 506, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972).

In *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), the Court declined to consider the claim that a state statute that had never been enforced was invalid, absent any prospect that it would be enforced against the plaintiffs, ruling that no justiciable controversy was presented where "compliance with [the challenged] statutes is uncoerced by the risk of their enforcement, . . . . " *Id.* at 508, 81 S.Ct. at 1758.

In *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), the Court held that the "actual controversy" requirement of the Declaratory Judgment Act was not met in an action seeking to challenge the constitutional validity of a state statute prohibiting the distribution of anonymous literature in connection with an election campaign, where in that case the public official against whom the offending literature had originally been directed was no longer standing for elective office. Similarly, the Sixth Circuit ruled in *Caldwell v. Craighead*, 432 F.2d 213 (6th Cir. 1970), *cert. denied* 402 U.S. 953, 91 S.Ct. 1617, 29 L.Ed.2d 123, that no actual controversy was presented by a high school student seeking a declaration that his suspension from school had violated his First Amendment rights, where in that case the plaintiff had moved to another city and enrolled in another high school.

On the other hand, in *Super Tire Engineering Co. v. McCorkle, supra,* the Court held that even after the labor dispute involved there was settled and the strike ended, there were sufficient residual effects (a "continuing and brooding presence") that an action seeking to challenge the validity of state programs making striking workers

eligible for public assistance was cognizable under the Declaratory Judgment Act.

Upon reviewing the arguments and authorities, the Court is satisfied that the instant case presents a live controversy of sufficient immediacy and substance to meet the standards enunciated in *Maryland Casualty Co., supra.* The statute in question is mandatory in its terms; neither the Director nor his subordinates at the local field offices have discretion to refuse a request for information that is properly presented on the appropriate form. Many requests are being made. In some instances, it appears, the type of disclosure here in issue has been the efficient cause of the resumption of abuse. The apprehension on the part of the plaintiffs is both real and realistic. The defendant's motion to dismiss for want of subject-matter jurisdiction must be denied.[1]

### CLASS CERTIFICATION

Plaintiffs seek to maintain this litigation as a class action on behalf of "all AFDC recipients in Michigan who are subject to the release of their names and addresses to the general public when they exercise their entitlement to AFDC Benefits." Complaint, Civil Action No. 8–71562, ¶ 43.

F.R.Civ.P. 23(c)(1) directs the trial court to pass upon the propriety of the class aspect of an action "[a]s soon as practicable after the commencement" thereof. *See Senter v. General Motors Corp.,* 532 F.2d 511 (6th Cir. 1976), *cert. denied* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150; *Garrett v. City of Hamtramck,* 503 F.2d 1236 (6th Cir. 1974). In this instance, the Court decided that the interests of judicial economy would be better served by delaying hearing and ruling on the motion for class certification until the projected cross-motions for summary judgment were ripe for argument and decision;[2] consequently, the argument relating to this motion was heard at the same time as that relating to the summary-judgment motions, and the Court's ruling is being set forth in the same memorandum opinion. Nevertheless, the Court wishes to underscore that while its consideration of the merits has accompanied its consideration of the question of class certification, the former has not formed the context for its ruling on the latter. The Court is mindful that Rule 23(c)(1) demands that the application of the Rule 23 standards be performed independently of and without regard to the merits or demerits of the plaintiff's claims, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), and has intended all along to observe that mandate with fidelity.

To establish their eligibility for class treatment, plaintiffs must demonstrate that they satisfy all the requirements of Rule 23(a) and that they fall within one of the subparagraphs of Rule 23(b). Rule 23(a) provides:

"One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

The plaintiffs seek to avail themselves of the provisions of Rule 23(b)(2):

"An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\*  \*  \*  \*  \*  \*

---

1. The State filed on September 15, 1978 a motion to dismiss under F.R.Civ.P. 12(b)(6). This motion addresses the same questions as are discussed at greater length in the cross-motions for summary judgment presently before the Court. Accordingly, the Court considers that the summary-judgment motions have superseded the 12(b)(6) motion and the plaintiffs' response thereto.

2. In view of the State's willingness to accede to the intervention of further individual plaintiffs as the need would arise, the urgency of ruling on the motion for class certification was appreciably diminished. As noted above, all parties were agreeable to the two adjournments of the hearing.

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . ."

The Court has no doubt that the putative class is sufficiently numerous that the joinder of all members would be impracticable, even though the size of the class cannot be determined with any degree of precision. Nor is there any question in the Court's mind as to the adequacy of the representation that these plaintiffs will confer upon the class. There have been no indications that their counsel are less than qualified, or that the plaintiffs will be less than vigorous in their promotion of the class's interests.

As to commonality and typicality—closely intertwined concepts—plaintiff must show that there are questions of law or fact common to their individual claims and to those of the remaining class members, and that the class claims are similar in overall nature to their own. As to the former requirement there can be no dispute here that both the factual and legal aspects common to the subclass of abused women far predominates over the individual features; as to typicality, however, the Court is of the opinion that the particular claims of abused women bring special considerations into play that set them apart from the rest of AFDC recipients. It has been clear throughout these proceedings that the focus of concern has been the abused woman who finds herself caught in the dilemma of either sacrificing her entitlement to public assistance under the AFDC program or of risking a recurrence of physical and emotional abuse. It has been chiefly in its application to such women that the Michigan statute has been challenged; it is their privacy interests that have been debated. They are the ones who have brought the individual actions and who have intervened. The Court is impressed that with respect to such persons special interests and considerations are brought to bear; it is persuaded that if a class is to be certified at all, it is to be composed only of those who answer this description.

In fact, the Court is of the opinion that this action should be certified as a class action. If the plaintiffs' claims withstand scrutiny on their merits, there is no question but that at least declaratory and possibly injunctive relief will be in order, so that the requirement of Rule 23(b)(2) is satisfied. Moreover, in contrast to *Craft v. Memphis Light, Gas and Water Division,* 534 F.2d 684 (6th Cir. 1976), *affirmed* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), and *Drumright v. Padzieski,* 436 F.Supp. 310 (E.D.Mich. 1977), the Court is satisfied that the certifying of a class in this instance will serve significant legal interests. In the *Drumright* case, *supra,* this Court, relying on *Craft, supra,* held

"that this action should not proceed as a class action. No significant interest will be advanced by allowing the action to be maintained on behalf of a class. Any relief that plaintiff may be able to prove himself entitled to will inure to the benefit of all those on whose behalf plaintiff asserts an interest." 436 F.Supp. at 325.

*Drumright* presented the question whether the Due Process Clause required that the Michigan Employment Security Commission conduct a hearing before it would either suspend or terminate the payment of unemployment compensation benefits. *Craft* involved a similar question regarding the termination procedures of a municipally owned utility. In both instances, the challenge was directed against the procedures on their face, *i. e.,* as they were being applied to all recipients or customers; in other words, there was raised no question that with respect to a certain group of recipients or customers the procedures in question could not legally be followed, regardless of their legitimacy as to the more general class.

Here, however, while one of plaintiffs' claims looks to the statutory scheme of welfare legislation and the other to penumbral emanations of other, more specific Constitutional liberties, both claims involve the privacy interests of the welfare recipient. Privacy is a largely relativistic concept. In

many, perhaps most situations the disclosure of a name and an address may be of no more consequence than the publication of similar data in a telephone directory. Under other circumstances, however, legal implications of transcendent significance may emerge. Finally, it is to be remembered that the plaintiffs are requesting injunctive as well as declaratory relief. If the Court enters an injunction on the premise that the challenged statute, policy, and practice of the State are invalid by reason of the particular privacy interests of the plaintiff class, that injunction will be effective only with respect to members of the certified class; the Court is not eager to curtail the State's administration of its affairs to any greater degree than necessary, and will enter no broader order than its holding on the merits dictates.

■ Accordingly, the Court certifies that this consolidated action may be maintained on behalf of all female recipients of benefits conferred under the AFDC program as administered by the Michigan Department of Social Services who have been the victims of physical and emotional abuse in the past at the hands of husbands or boyfriends and who fear that the disclosure of their names and current addresses by DSS personnel will lead to a recurrence of abusive treatment.[3]

## THE MERITS

The issues on the merits, as narrowed through the course of proceedings, have resolved themselves into two: (1) Does the Michigan statute compelling disclosure conflict with applicable federal statutes and regulations? (2) Does the federal constitutional right of privacy, made applicable to the States through the Fourteenth Amendment, preclude the Michigan legislature from imposing on the recipients of AFDC benefits the condition of risking the disclosure to members of the general public of their names and addresses? The second question in turn breaks down analytically into two subsidiary questions: (a) Does the recipient possess a constitutional privacy interest in the nondisclosure of her name and address? (b) If so, is that interest infringed by the DSS practice being challenged here?

■ It is a deeply rooted principle of American constitutional jurisprudence that constitutional issues not be addressed until all alternative grounds for relief have been explored and found wanting. *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Peters v. Hobby,* 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955); *Alma Motor Co. v. Timkin-Detroit Axle Co.,* 329 U.S. 129, 67 S.Ct. 231, 91 L.Ed. 128 (1946); *Seals v. Quarterly County Court of Madison County, Tenn.,* 526 F.2d 216 (6th Cir. 1975). In the instant case this doctrine of avoidance compels the Court to consider plaintiffs' statutory claim first and to pass upon their constitutional privacy claim only in the event that its disposition of the statutory claim fails to afford the full relief that plaintiffs seek. An extended discussion of the interplay of state and federal statutes and regulations is accordingly in order at this point.

The State statute in question is Section 64 of the Michigan Social Welfare Act, M.C.L.A. § 400.64. The pertinent provisions of that section are set out in the margin.[4] The

---

**3.** The Court is satisfied that even as thus narrowed the class is sufficiently numerous that joinder of all members would be impractical and, therefore, that the requirement of Rule 23(a)(1) is still met.

**4.** "(1) Notwithstanding the provisions of section 35, all applications and records concerning any applicant for or recipient of any form of aid or relief under the terms of this act, except medical assistance, shall be considered public records and shall be open to inspection by persons duly authorized by the federal or state government, the state department or the duly elected officials of the county, city or district involved, in connection with their official acts and by the general public as to the names and addresses of recipients and the amounts of such aid or relief granted. General public access shall be restricted to only such persons who shall present a signed application containing the name, the address and the occupation of the persons signing such application. It shall be unlawful for any person to utter or publish such names or addresses except in cases where fraud is charged or wrongful grant

statute mandates the open *disclosure* by state officials to members of the general public of the names and addresses of recipients and the amounts of public assistance granted to them. Failure to disclose subjects the state officials to penalties of fine, imprisonment, and dismissal. Disclosure is made conditional upon the presentation of "a signed application containing the name, the address and the occupation of the persons signing such application." Except for the purpose of exposing welfare fraud or administrative mishandling, the *publication* of names and addresses of recipients thus obtained is expressly forbidden, as is the use of such names and addresses for political or commercial ends. These prohibitions are enforceable by sanctions making violation of the statute a misdemeanor, punishable by two years' imprisonment and/or a fine of up to $1,000.

Part A of Title IV of the Social Security Act of 1935, 42 U.S.C. §§ 601–610, established the Aid to Families with Dependent Children program and set forth the ground rules by which it was to be administered. It was unquestionably with the intention of creating a "plan" eligible for participation in the AFDC program, among others, that the Michigan legislature enacted its Social Welfare Act in 1939. *See* Preamble preceding M.C.L.A. § 400.1.

Section 402 of the Social Security Act, as amended, 42 U.S.C. § 602,[5] places certain limitations on the States' right to receive federal funds to finance their social welfare programs out of Social Security funds. One such limitation relates to the States' power to permit disclosure of information concerning applicants and recipients, and is set forth at § 602(a)(9). That provision formerly read:

"(a) A State plan for aid to dependent children must . . . (9) provide safeguards which restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with the administration of aid to families with dependent children; . . ."

In *Indiana v. Ewing,* 99 F.Supp. 734 (D.D.C.1951), the court ruled that with respect to old-age assistance payments there was a rational basis to support the determination of the Administrator of the Federal Security Agency that the effect of an Indiana statute was to render that State ineligible to receive Social Security funds to finance its program. The offending statute, as described by Judge Holtzoff,

"requires the county welfare board of each county to file with the county auditor a report showing names and addresses of all recipients of payments under the Act, together with the amount paid to each. This section further provides that the reports so filed with the county auditor shall be bound in a separate record book, and that this book and all reports contained therein shall be public records and shall be open to public inspection at all times during the regular office hours of the county auditor." *Id.* at 735.

The impact of the statute was tempered appreciably by the limitation provided in the next section prohibiting "the disclosure or use of any lists of names or other similar information for commercial or political pur-

---

of aid is alleged; and it shall be unlawful to use such names or addresses for political or commercial purposes.

\* \* \* \* \* \*

"(3) In each county, the department of social services shall maintain an alphabetical index file in its office of cases receiving assistance through such department. Whenever a citizen makes a personal visit to one of said offices during its regular office hours, and makes inquiry as to the name, address or amount of assistance being received by any person, he shall be given promptly the information requested. If any employee shall fail to furnish promptly to any caller the required information

he shall be found insubordinate and subject to immediate dismissal.

\* \* \* \* \* \*

"(4) Any person who shall violate the provisions of this act shall upon conviction thereof be guilty of a misdemeanor, punishable by imprisonment in the state prison for a term of not more than 2 years, or by a fine of not more than $1,000.00, or by both.

\* \* \* \* \* \*"

5. Hereafter the Court will refer to this provision by its number as codified in Title 42 of the United States Code.

poses of any nature, or for any purpose not directly connected with the administration of public assistance." *Id.*

Nonetheless, the court ruled that it was compelled to support the determination of the Agency that the Indiana statute conflicted with the provision of 42 U.S.C. § 302(a)—clearly an analog of former § 602(a)(9)—restricting "the use or disclosure of information concerning applicants and recipients to purposes directly connected with the administration of old-age assistance." *Id.* The result of granting the Administrator's motion for summary judgment was to cut off Indiana's eligibility for federal funds in the financing of its old-age assistance program.

To relieve the turmoil that this ruling inflicted on Indiana, Senator Jenner of that State masterminded the passage of 42 U.S.C. § 1306a.[6] That section, commonly called the Jenner Amendment, provides that a State's eligibility for federal funds under the various public welfare programs supported under the Social Security Act, including AFDC, will not be jeopardized by its implementation and application of legislation permitting public access to "records of the disbursement" of such funds, on the condition, however, that if such access leads to the disclosure of names, that information may not be used for commercial or political purposes.

The effect of this provision under the current state of the law is the decisive question presented in the instant case.

■ The task undertaken by any court in construing a statute is to discover and give effect to the intent of the legislature that enacted it. Charged with the duty of applying a statement of general legal principle to the almost limitless variety of partic-ular human experiences, the judge is called to implement not his own will but that of the collective body to whom is assigned the function of articulating such principles. In carrying out his assignment, he has at his disposal several tools, among them: the language, the integrity of which it is the duty and interest of both courts and legislatures to preserve; the earlier pronouncements of other courts; the interpretations advanced by those entrusted with the execution of the legislative will; and the subsequent enactments of the legislature.

■ The starting point in any project of statutory interpretation is the language employed by the legislature. Absent compelling reasons for it to do so, a court may not countermand the literal language of a legislative directive. In the instant case, the literal language of § 1306a is not dispositive. The statute literally prohibits the federal government from reacting in a certain way (viz., by cutting off federal funds) when a State permits public access to "records of disbursements." Notably, the statute does not define that phrase, and it does not literally require that names be included in the favored category with respect to which the federal government must defer; rather, it foresees that the disclosure of records of disbursement *might* reveal names (perhaps by mistake or inadvertence? perhaps in the indulgence of Congress, to be expressed elsewhere?) and ordains that the States must prohibit the use of names thus disclosed for certain purposes.

It would, of course, be sheer sophistry to end the analysis there. To so construe the Jenner Amendment would be to disregard utterly the circumstances of its enactment and the consequences it produced.[7] The

---

6. "No State or any agency or political subdivision thereof shall be deprived of any grant-in-aid or other payment to which it otherwise is or has become entitled pursuant to title I (other than section 3(a)(3) thereof), IV, X, XIV, or XVI (other than section 1603(a)(3) thereof) of the Social Security Act, as amended, by reason of the enactment or enforcement by such State of any legislation prescribing any conditions under which public access may be had to records of the disburse-ment of any such funds or payments within such State, if such legislation prohibits the use of any list or names obtained through such access to such records for commercial or political purposes."

7. The Jenner Amendment was enacted on October 20, 1951 as part of the Revenue Act of 1951. Within months, the District of Columbia Circuit Court of Appeals reversed Judge Holtzoff and remanded with directions to dismiss

sequence of events and confluence of circumstances make it palpably clear that § 1306a was tailored precisely to the practice authorized by the Indiana statute to which *Ewing, supra,* was addressed. In that light it becomes clear that in the mind of the Congress that enacted it the category of "records of disbursement" to which the Jenner Amendment permitted access included the names, addresses, and amounts of assistance of welfare recipients.

The critical question with which this Court is faced becomes, then, whether the Jenner Amendment applies with equal vigor today with respect to Title IV.

The Court can draw no guidance from judicial gloss; it has found only one reported decision construing the Jenner Amendment. In general fashion, that court viewed it, without reference to the foregoing history, as an expression of congressional concern with the legitimate privacy interests of Social Security beneficiaries. *See Jaffess v. Secretary, HEW,* 393 F.Supp. 626 (S.D.N.Y.1975).

Nor is the inquiry further advanced by examination of the administrative interpretations currently in effect. The Department of Health, Education, and Welfare has promulgated regulations regarding the nondisclosure requirements of the Social Security Act as they bear upon Title IV, but these are inconclusive. Collected and codified at 45 CFR § 205.50, they conclude at paragraph (e) with an almost exact reiteration of the Jenner Amendment.[8] Under paragraph (a), limitations on the disclosure and use of application data are prescribed that essentially track the provisions of the current § 602(a)(9), but those requirements are expressly subordinated to the provisions of the Jenner Amendment, as incorporated in paragraph (e), yet only to the extent that the Jenner Amendment is otherwise applicable:

"(a) *State plan requirements.* A State plan under title IV–A of the Social Security Act, except as provided in paragraph (e) of this section, must provide . ."

Section 205.50(a) goes on to specify at subparagraph (2):

"(2) The [State] agency will have clearly defined criteria which govern the types of information that are safeguarded and the conditions under which such information may be released or used. Under this requirement:

"(i) Types of information to be safeguarded include but are not limited to:

"(A) The names and addresses of applicants and recipients and amounts of assistance provided (unless excepted under paragraph (e) of this section); . . ."

The regulations themselves are notably silent as to the meaning and effect of the Jenner Amendment and its paragraph (e) replica. Therefore, just as the final proviso of the Jenner Amendment, in its literal language, contemplates no more than the *possibility* that public access to the records of disbursement may lead to the disclosure of names, without expressly authorizing or compelling such a result, so also the pertinent regulations extend the *invitation* to construe "records of disbursement" to include the names and addresses of recipients while stopping short of making that construction themselves.

The Court now turns to a consideration of the course of congressional enactments. The version of § 602(a)(9) that was set forth at an earlier point in this opinion was first enacted in 1939 by amendment of the Social Security Act of 1935. Its meaning, as declared, by assimilation, in *Ewing, supra,* was modified by the passage of the Jenner

---

the complaint on mootness grounds. 90 U.S. App.D.C. 420, 195 F.2d 556 (1952).

8. "(e) *Exception.* In respect to a State plan under title I, IV–A, X, XIV, or XVI of the Social Security Act, exception to the requirements of paragraph (a)(1)(iii) of this section may be made by reason of the enactment or enforcement of State legislation, prescribing

any conditions under which public access may be had to records of the disbursement of funds or payments under such titles within the State, if such legislation prohibits the use of any list or names obtained through such access to such records for commercial or political purposes."

Amendment in 1951. In 1975, § 602(a)(9) was substantially revised so that it now reads:

"(a) A State plan for aid and services to needy families with children must . . (9) provide safeguards which restrict the use of [*sic* : or?] disclosure of information concerning applicants or recipients to purposes directly connected with (A) the administration of the plan of the State approved under this part, the plan or program of the State under part B, C, or D of this subchapter or under subchapter I, X, XIV, XVI, XIX, or XX of this chapter, or the supplemental security income program established by subchapter XVI of this chapter, (B) any investigation, prosecution, or criminal or civil proceeding, conducted in connection with the administration of any such plan or program, and (C) the administration of any other Federal or federally assisted program which provides assistance, in cash or in kind, or services, directly to individuals on the basis of need; and the safeguards so provided shall prohibit disclosure, to any committee or a legislative body, of any information which identifies by name or address any such applicant or recipient; . . ."

42 U.S.C. § 602(a)(9) (1978 Supp.).

As now amended, § 602(a)(9) declares that as a condition of compliance with the Act, the States must provide safeguards to limit the disclosure and use of the information that is divulged by AFDC applicants in the application process to three specifically defined purposes. Even within the confines of these three purposes, it foresees that abuses might occur and it operates to forestall one such abuse in denying access specifically to the names and addresses of applicants and recipients to legislative bodies directly, and indirectly through their committees.

The Court must assume that Congress intended to be logical and that its measures be given effect. It is not logical to suppose

that Congress would be content to deny access to specific information to a committee chairman acting in the discharge of his official duties, in investigating the administration of the Act, for example, and yet to permit almost untrammeled access to the same information to the chairman's legislative assistant in his private capacity and, in turn, to the chairman. The Court is reluctant to ascribe such illogic to our national legislators and to render nugatory this latest expression of the Congressional mind and will.

■ The Court, then, views § 602(a)(9) as it now stands as a Congressional determination that at least with respect to information regarding names and addresses, and notwithstanding the legitimate interests on the other side, the privacy interests of the individual applicant and recipient require nondisclosure except in certain specifically articulated instances. The Court holds that those exceptions from the general rule of nondisclosure are enumerated exclusively in the provisions of § 602(a)(9). Therefore, in broad and general fashion, a State may permit disclosure of any information gathered with regard to individual applicants or recipients *if and only if* the person requesting the information is directly motivated by and concerned with (1) the administration of a Social Security assistance program, (2) an investigation, prosecution, or civil action involving the possibility of welfare fraud or bureaucratic ineptness, or (3) the coordination of the AFDC programs with other federal or federally-funded welfare programs.

■ Just as the original version of § 602(a)(9) had to be read in the light of the subsequent enactment of the Jenner Amendment, so also must the Jenner Amendment be read in the light of the subsequent amendment of § 602(a)(9) now in force. To the extent that the Court's construction of the latter provision renders the former inoperative—a question with which the Court need not concern itself—that result is unavoidable.[9]

---

**9.** It is to be borne in mind that the Jenner Amendment was fashioned in haste to cope with the peculiar circumstances of a specific emergency. It succeeded in its design to spare Indiana from the imminent loss of federal funds. Indeed, it could even be reasoned that

238

■ It remains for the Court to consider whether the Michigan statute here under attack, M.C.L.A. § 400.64, meets the standards prescribed in 42 U.S.C. § 602(a)(9) as just described.

It would be inaccurate to say that the challenged statute prescribes no safeguards. It limits the information available to names and addresses of recipients and the amounts of their assistance. It forbids publication of the names and addresses of recipients except for certain circumscribed purposes. It requires that persons seeking disclosure identify themselves by name, address, and occupation, and it prohibits the use of names and addresses so disclosed for political or commercial purposes. Finally, it prescribes heavy sanctions for the enforcement of its provisions.

The Court must determine, however, whether these safeguards are adequate. It is satisfied that Section 64 does not provide for the level of safeguards required by § 602(a)(9). The State admits that but for the temporary restraining order presently in effect, the statute would operate in the instant cases to compel the disclosure of plaintiffs' names and addresses to their husbands or boyfriends. Yet the disclosure of plaintiffs' names and addresses to would-be abusers cannot, in any way perceptible to this Court, serve any of the permissible purposes specifically laid down by the federal statute. Therefore, the persons whom plaintiffs fear can satisfy all the conditions of Section 64 without bringing themselves within any one of the parameters of § 602(a)(9).

The Court concludes that in failing to provide safeguards compatible with the dictates of 42 U.S.C. § 602(a)(9), the State of Michigan is out of compliance with the requirement of Title IV of the Social Security Act. A decree to that effect will be entered.

in light of the holding of *King v. Smith, infra,* and *Rosado v. Wyman, infra,* to the effect that the consequence of failing to comply with the Act is not the risk of losing federal funds but the liability of being forced to comply (see discussion *infra* ), the Jenner Amendment has

## RELIEF

There has arisen a dispute between the parties as to the appropriate remedy to be applied in the event that the Court were to find, as it has, that the Michigan Social Welfare Act does not comply with the requirements of the Social Security Act. The State contends that the Court's power is limited to a declaration of ineligibility for further federal funding, while the plaintiffs' position is that the Court has jurisdiction to enter a compulsory order directing the State to bring its plan into compliance.

The State's view rests on the theory that the provisions of the Social Security Act constitute an offer of aid to the States that they are free to accept or to reject on the terms and conditions prescribed; if a given State does not subscribe to a certain condition, the result of its noncompliance is that it becomes ineligible for the funds to which it would otherwise be entitled under the terms of the federal government's offer; it cannot be compelled to accept that offer, however.

This contract conceptualization of the AFDC program has an attractive logical consistency to it and is directly supported by the concurring opinion of the Chief Justice in *Townsend v. Swank,* 404 U.S. 282, at 292, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971). It appears, however, that in espousing this view the Chief Justice stands alone among his brethren.

The seminal case in this regard is *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Early in its opinion, the Court described the program in a manner that comports closely with the State's thesis:

"The AFDC program is based on a scheme of cooperative federalism. It is financed largely by the Federal Government, on a matching fund basis, and is administered by the States. States are

no further, legitimate purpose to serve. Perhaps, then, the subsequent development of the law, unforeseen in *Ewing, supra,* furnishes valid and sufficient reason to limit § 1306a to its precise terms.

not required to participate in the program, but those which desire to take advantage of the substantial federal funds available for distribution to needy children are required to submit an AFDC plan for the approval of the Secretary of Health, Education and Welfare (HEW). The plan must conform with several requirements of the Social Security Act and with rules and regulations promulgated by HEW." *Id.* at 316–7, 88 S.Ct. at 2133. (Footnotes and citations omitted.)

Nevertheless, the Court reached the conclusion that the Act imposes affirmative obligations upon the States that can be enforced against them, *id.* at 333, 88 S.Ct. 2128, and applied that principle by declaring *invalid* an Alabama regulation that it found to be inconsistent with the Act.

The Court was animated in this holding in part by the view that the AFDC program is designed to benefit needy, dependent children rather than the States, "that protection of such children is the paramount goal of AFDC." *Id.* at 325, 88 S.Ct. at 2137.[10] To this Court's mind, it reflects a sensitive comprehension of the realities of the situation as well. Given the federal government's massive involvement in the welfare programs administered by the States, it is inconceivable that any State would choose to forgo the funds made available to it under the Act. Thus, participation in the program is assumed, it is a starting point of analysis, it forms part of the context out of which the Court fashions an appropriate remedy.

This is, in substance, the view adopted by the Supreme Court when it first addressed the question of the appropriateness of injunctive relief in such a case. The perti-

nent discussion of the Court in *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), is worth reiterating here:

"We are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program. [Citations omitted.] We adhere to *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), which implicitly rejected the argument that the statutory provisions for HEW review of plans should be read to curtail judicial relief and held Alabama's 'substitute father' regulation to be inconsistent with the federal statute. While *King* did not advert specifically to the remedial problem, the unarticulated premise was that the State had alternative choices of assuming the additional cost of paying benefits to families with substitute fathers or not using federal funds to pay welfare benefits according to a plan that was inconsistent with federal requirements.

"The prayer in the District Court in *Smith v. King,* as in the case before us, was for declaratory and injunctive relief against the enforcement of the invalid provision. 277 F.Supp. 31 (D.C.M.D.Ala. 1967). We see no justification in principle for drawing a distinction between invalidating a single nonconforming provision or an entire program. In both circumstances federal funds are being allocated and paid in a manner contrary to that intended by Congress." *Id.* at 420–1, 90 S.Ct. at 1222.

In *Townsend v. Swank, supra,* it appears that the plaintiffs had prayed for no more than declaratory relief.[11] In *Carleson v.*

---

**10.** In line with the contract theory advanced by the State herein, one could view the AFDC recipients (or, at least, their dependent children) as third-party beneficiaries of the State's contract with the federal government, with power to enforce against the State its promise to abide by the conditions of eligibility.

**11.** With reference to the similar context of federal funds made available to the States under Title III of the Social Security Act for the funding of their unemployment compensation pro-

grams, the Chief Justice, writing for a unanimous Court, cited *King v. Smith, supra,* and *Rosado v. Wyman, supra,* as support for the proposition that an injunction will lie to prohibit enforcement of a State statute that is inconsistent with the Social Security Act. *California Department of Human Resources Development v. Java,* 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971) at 135. The *Java* opinion was issued less than eight months before the Chief Justice's concurring opinion in *Townsend v. Swank, supra.*

*Remillard,* 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972), however, the Court displayed no hesitation in affirming, on the basis of *King v. Smith, supra,* and *Townsend v. Swank, supra,* the issuance of an injunction enforcing the District Court's declaration that a California regulation conflicted with a provision of Title IV of the Act.

█ Therefore, on the basis of the foregoing discussion, the Court rules that it has the power to issue an injunction compelling the State to bring its plan into compliance with the dictates of the Act, in conformity with its decree.

In the exercise of that power, however, the Court must first address the question of the appropriate scope of its injunction. Earlier in this opinion, it was foreseen that if an injunction was to be entered, the scope of its application would be scaled to the Court's holding on the merits. The Court has interpreted a provision of general application; the thrust of § 602(a)(9) is not factually specific, but relates without distinction to all recipients of AFDC benefits.

█ Upon reflection, however, the Court is persuaded that its injunction must extend only to the instant plaintiffs and the plaintiff class. They are the only ones before the Court; they are the only ones who, to the Court's knowledge, are suffering actual harm from the challenged statute, policy, and practice. The Court bears in mind also that this type of situation, viz., that of the abused mother, was one not contemplated (perhaps it could not reasonably have been) by the legislative bodies that considered the question of public access in enacting the Social Welfare Act. There may well arise other situations and circumstances that will require scrutiny and the balancing of conflicting interests. It is certainly the better course to leave to an informed legislature, with its special resources, expertise, and public interest, the task of fashioning appropriate safeguards. In the meantime, however, the State must refrain from disclosing the names and addresses of the plaintiffs to these actions and of those who document their membership in the plaintiff class.

In view of the Court's ruling on the plaintiffs' statutory claim and the relief that it is ordering, it need not and does not consider their constitutional claim.

Therefore, in light of the foregoing, the defendant's motion to dismiss for want of subject-matter jurisdiction is DENIED; plaintiffs' motion for class certification is GRANTED within the limits set forth herein; defendant's motion for summary judgment is DENIED; and plaintiffs' motion for summary judgment in their favor is GRANTED.

IT IS SO ORDERED.